# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF NEW YORK

| UNITED STATES OF AMERICA, | : | |
| --- | --- | --- |
| | : | **DEFENDANT ADOLFO LACOLA'S** |
| PLAINTIFF, | : | **SENTENCING MEMORANDUM** |
| | : | |
| vs. | : | **1:19-cr-00187-MKB** |
| | : | |
| ADOLFO LACOLA, ET AL, | : | |
| | : | |
| | : | |
| DEFENDANT. | | |

Defendant Adolfo LaCola respectfully submits this sentencing memorandum for consideration for his sentencing now scheduled for March 12, 2021 at 9:00 a.m. before the Honorable Chief Judge Margo K. Brodie.

**Preliminary Statement about Evidence at the Sentencing**

As to certain facts recited herein about Mr. LaCola's involvement in the crimes charged, most of them can be shown by the undercover recordings that the government has produced in this case. And if there is any disagreement about these facts, the applicable recordings can be played at the sentencing hearing.

**Introduction**

On September 18, 2020, Mr. LaCola pled guilty to Count 1 for Cocaine Distribution Conspiracy and to Count 2 for Money Laundering Conspiracy of the Superseding Indictment. Mr. LaCola has taken responsibility for his conduct both before and after his arrest and, while very serious, Mr. LaCola's limited role in the conspiracy along with the circumstances set forth herein, including Mr. LaCola's lack of a prior criminal record and his eligibility for application of the safety valve provision, we respectfully submit that he should be sentenced below the

1

statutory minimum for these offenses. In light of all the factors considered on sentencing, including that of the 22 months that Mr. LaCola has been incarcerated at the Metropolitan Detention Center ("MDC") in Brooklyn, fully 12 months have been during COVID-19 and thus with the debilitating restrictions the pandemic has required, the defense respectfully submits that time-served or no more than a three-year sentence is appropriate in this case.

## Sentencing Standard

This Court should impose a sentence "sufficient but not greater than necessary" to achieve the statutory purposes of punishment, as outlined in 18 U.S.C. §3553(a), under the principles enumerated in *United States v. Booker*, 543 U.S. 220 (2005) and its progeny. *See, Gall v. United States*, 128 S.Ct. 586 (2007); *Kimbrough v. United States*, 128 S.Ct. 558 (2007); *United States v. Crosby*, 397 F.3d 103, 111 (2d Cir. 2005) The Court should consider the applicable, non-binding Sentencing Guidelines (18 U.S.C. § 3553(a)(4)) and the factors articulated under 18 U.S.C. § 3553(a)(2). These will each be discussed separately below.

## SENTENCING FACTORS

**I.    Mr. LaCola Should Be Sentenced Below the Mandatory Minimum and Guidelines Range**

**A. The Safety Valve Exception**

Pursuant to 18 U.S.C. § 3553(f) and its implementing guideline, U.S.S.G. § 5C1.2, courts may impose lesser sentences, providing a "safety valve" from mandatory minimum sentences in some drug cases, if five criteria are satisfied. *United States v. Gaskin*, 364 F.3d 438, 469 (2d Cir. 2004) Pursuant to section 3553(f), in cases involving certain drug offenses, courts may, under certain circumstances, impose a sentence "without regard to any statutory mandatory minimum sentence." 18 U.S.C. § 3553(f). Section 3553(f) sets out the following requirements a defendant must satisfy in order to be safety valve-eligible:

(1) the defendant does not have--
- (A) more than 4 criminal history points, excluding any criminal history points resulting from a 1-point offense, as determined under the sentencing guidelines;
- (B) a prior 3-point offense, as determined under the sentencing guidelines; and
- (C) a prior 2-point violent offense, as determined under the sentencing guidelines;

(2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;
(3) the offense did not result in death or serious bodily injury to any person;
(4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise, as defined in section 408 of the Controlled Substances Act; and
(5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

Information disclosed by a defendant under this subsection may not be used to enhance the sentence of the defendant unless the information relates to a violent offense.

18 U.S.C.A. § 3553; *United States v. Kissi*, 469 F. Supp. 3d 21, 34–35 (E.D.N.Y. 2020)

Mr. LaCola meets all five criteria for safety valve eligibility:

1. Mr. LaCola has zero criminal history points.

2. Mr. LaCola did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offenses.

3. The offenses did not result in death or serious bodily injury to any person.

4. Mr. LaCola was not an organizer, leader, manager, or supervisor of others in the offense.

5. Mr. LaCola has truthfully provided to the Government all information and evidence the defendant has concerning the offenses.

### B. Mr. LaCola Qualifies for the Safety Valve Two-Level Downward Adjustment

Mr. LaCola qualifies for the safety valve and a two-level downward adjustment which permits this Court to consider a sentence below the mandatory five years on the cocaine distribution conspiracy count. *See,* 18 U.S.C.A. § 3553; U.S.S.G. §§ 5C1.2(a); 2D1.1(b)(18).

As to the first three criteria, Mr. LaCola's lack of criminal record and no use of violence or threats are clear on the record and undisputed. (Mr. LaCola has no history of violence whatsoever.)

As to the fourth factor, Mr. LaCola was not a leader/organizer, as acknowledged by the government and at paragraphs 17 and 18 of the Presentence Investigation Report ("PSR" herein). "A defendant may properly be considered a manager or supervisor if he exercised some degree of control over others involved in the commission of the offense ... or played a significant role in the decision to recruit or to supervise lower-level participants." *United States v. Burgos*, 324 F.3d 88, 92 (2d Cir. 2003) Factors the court should consider include the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. *See,* U.S.S.G. 3B1.1, Application Note 4. This adjustment does not apply to a defendant who merely suggests committing the offense. *Id.*

The evidence offered against Mr. LaCola shows that the confidential informant asked Mr. LaCola about money laundering and Mr. LaCola said he would see if he could find someone who could do it. Mr. LaCola did not know how to launder himself and did not direct that operation. He asked Patrick Tidalgo if he could do it and Tidalgo decided to work with the

confidential informant. Mr. LaCola's was to get a small cut for connecting and assisting the parties. But he actually never received anything from the 10% commission kept by Mr. Tidalgo and he did not control how others got paid. On the first transaction (6/26/2018), Mr. LaCola received the money, counted it, and dropped it off for Mr. Tidalgo to launder through Mr. Tidalgo's company, Vape Works, LLC. On the second transaction (9/30/18), Mr. LaCola came by the room of the confidential informant early and discussed that he was continuing to pursue the legal marijuana industry in California and he wanted out of this operation. Mr. Tidalgo showed up later after Mr. LaCola left and confirmed the same to the confidential informant, that Mr. LaCola wanted out and was afraid of losing his license to do legitimate business in California. Mr. Tidalgo then counted the money with the confidential informant that Tidalgo agreed to launder for this second transaction. (PSR ¶ 14) Mr. LaCola was not the leader. Likewise, Mr. LaCola was not running the cocaine operation. He invested money with Carlos Madrid expecting a return and made introductions thinking he might get a payment, but he was not controlling the transactions. Mr. LaCola was otherwise involved with exchanging some small cocaine samples between the parties. He was the "low-level guy," asking questions about how things worked, explaining his lack of experience with cocaine, and taking direction from others, all as is demonstrated on the undercover recordings. Mr. LaCola connected parties who had their own services to offer from which they could potentially financially benefit; he did not control or direct any of them. *Compare, e.g., United States v. Burgos*, 324 F.3d 88, 90 (2d Cir. 2003)("The nature of this transaction itself does not bespeak control. Dyckman offered his services to Alejo (via Dominguez) as a broker of stolen checks and furnished a cash incentive for Alejo's thefts; but there is no evidence that Dyckman directed Alejo (or anyone else) to steal checks, or conditioned payment on any further acts by Alejo, or directed Alejo to call Infanti to

5

find out the status of the final check.") Neither Mr. Tidalgo or Mr. Madrid were subordinate to or managed by Mr. LaCola.

Being equals or partners in the crime is insufficient to qualify Mr. LaCola as a leader/organizer as well. *See, United States v. Greenfield*, 44 F.3d 1141, 1146 (2d Cir. 1995)(organizer enhancement inapplicable where participants in scheme are equals) citing *United States v. Katora*, 981 F.2d 1398, 1402–03 (3d Cir. 1992)("The district court's findings that Katora and Squire shared responsibility for creating and carrying out the fraud do not indicate that either Katora or Squire organized the other"… section 3B1.1 cannot enhance the sentences of a "duo when they bear equal responsibility for "organizing" their own commission of a crime")[1]

As to the fifth requirement, the government does not dispute that Mr. LaCola was fully truthful on all conduct – the offenses charged and the obstruction after arrest. His prior bad conduct and deception after his arrest does not render Mr. LaCola ineligible for the safety valve where he has fully disclosed and taken responsibility for his conduct. *See, United States v. Schreiber*, 191 F.3d 103, 108–09 (2d Cir. 1999)("we join other circuits to hold that lies and omissions do not disqualify a defendant from safety valve relief so long as the defendant makes a complete and truthful proffer not later than the commencement of the sentencing hearing"); *United States v. Jeffers*, 329 F.3d 94, 98-99 (2d Cir. 2003)("We find no basis for concluding that a defendant's perjury at trial can disqualify him from safety valve eligibility at the threshold. . . the language of the statute allows for no such per se disqualification … [and] a defendant's perjury is accounted for in the enhancement for obstruction of justice under U.S.S.G. § 3C1.1); *Viera v. U.S.*, 832 F. Supp. 2d 222, 228 (E.D.N.Y. 2011)(Vitaliano, J.)( *Schreiber* and *Jeffers*

---

[1] U.S.S.G. 5C1.2, Application Note 5: "Organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines," as used in subsection (a)(4), means a defendant who receives an adjustment for an aggravating role under § 3B1.1 (Aggravating Role).

"together hold that if a defendant makes a complete and truthful proffer at the start of his sentencing hearing, he complies with the fifth factor for a safety valve reduction even if he had previously committed perjury or lied to the government or obstructed its investigation."); *Betancourt v. U.S.*, 10-CR-905-LTS, 2019 WL 1953930, at *4 (S.D.N.Y. May 1, 2019)("previous dishonesty does not render him ineligible for the safety valve if he truthfully and fully discloses his role in the offense prior to sentencing").

Here, not only has the obstruction enhancement been applied without challenge (PSR ¶¶ 21, 36), but Mr. LaCola was remanded for his conduct and has been incarcerated for the last 22 months where, since MDC's response to COVID-19 last year in March 2020, he has regularly been on periods of lockdown, unable to leave his cell or contact his family or counsel for extended periods of time as he otherwise would be in normal circumstances. Moreover, the policy behind the safety valve seeks to encourage defendants to come clean and cooperate, even those like Mr. LaCola (who were out on bail and screwed up big time), as long as they finally set things right before sentencing. *Contrast, United States v. Gonzalez Cueto*, 803 Fed. Appx. 552, 554–55 (2d Cir. 2020)(unpublished)("district court did not err in concluding that Gonzalez Cueto was not entitled to safety-valve relief because it found that he was untruthful about his involvement in the offense at trial, *and he maintained that version of the events during the proffer*.")(emphasis added) Mr. LaCola fully acknowledged and disclosed his conduct to qualify for the safety valve.

Mr. LaCola has satisfied the criteria for application of the safety valve to apply here, even considering his misconduct both before and after arrest. *See, United States v. Mejia-Pimental*, 477 F.3d 1100, 1104–08 (9th Cir. 2007) citing *United States v. Schreiber,* 191 F.3d 103 (2d Cir.1999) ("The breadth of the "good faith" requirement in the context of the safety

7

valve is limited by the boundaries of the statutory language; that is, a defendant satisfies his "good faith" obligation by providing the Government with truthful, complete information by the time of the sentencing hearing. Anything else would unjustifiably impose on a defendant an additional burden above and beyond the plain meaning of the text of § 3553(f).") Furthermore, this is a case aligned with the purpose of the safety valve exception:

> The purpose of the safety valve was to remedy a perceived inequity resulting from mandatory minimum sentences. More culpable criminals could lessen their sentences by trading valuable information, but less culpable defendants might lack such leverage. The safety valve allows low-level offenders without appreciable criminal history to proffer the information they have, provided it is truthful and entire, and become eligible for a two-level downward adjustment and no mandatory minimum sentence. …it is intended to encourage the taking of responsibility for one's criminal actions.

*Borras v. United States*, No. 02 CIV. 9432 (AKH), 2003 WL 21960991, at *2–3 (S.D.N.Y. Aug. 13, 2003) Mr. LaCola has so taken responsibility for his actions.

Further, the plain meaning of these provisions limits a court's discretion in determining whether or not the statutory criteria have been met; once it has been determined that they have, the court is required to disregard any mandatory minimum in imposing sentence. *United States v. Jeffers*, 329 F.3d 94, 100 (2d Cir. 2003) citing *United States v. Chen,* 127 F.3d 286, 290 (2d Cir.1997) ("[A] sentencing court *must* disregard statutorily mandated minimum sentences for certain narcotics offenses where the defendant [complies with § 3553(f)(1)-(5)].")

If this Court finds that Mr. LaCola has satisfied the safety valve, he is entitled to a two-level downward adjustment in his offense level as provided for in U.S.S.G. § 2D1.1(b)(18), that instructs: "If the defendant meets the criteria set forth in subdivisions (1)-(5) of subsection (a) of § 5C1.2 (Limitation on Applicability of Statutory Minimum Sentences in Certain Cases), decrease by 2 levels. *See, e.g., United States v. Osei,* 107 F.3d 101, 103-05 (2d Cir.1997) (per curiam) Such a downward adjustment would result in a total offense level of 27.

### C. The Section 3553(a) Factors Support a Downward Departure

#### 1. The nature and circumstances of the offense

Conspiracy to launder drug money and to distribute cocaine are both serious charges, however, the limit of Mr. LaCola's involvement should be considered.

As described above under the leader/organizer analysis, Mr. LaCola had never been involved in money laundering nor cocaine distribution before the activities involved in this case. Mr. LaCola decided to participate in these two activities to try to make fast money before moving on to a new life in California to pursue a venture in the legitimate marijuana industry. Mr. LaCola had made efforts to earn money through other legal options. He had sold his house and was using part to live on while he sought to invest the rest of the money, ultimately making the ill-advised decision to invest in cocaine and participate in some street-level deals. When pressed by a friend (confidential informant) to assist with money laundering, Mr. LaCola referred Mr. Tidalgo and on one occasion met and counted the money and was expecting to receive a small cut for doing so. While not to discount the seriousness of the activities in which Mr. LaCola became involved, Mr. LaCola was not a controlling party.

As to the post-arrest conduct, Mr. LaCola tried to have it both ways contrary to his release conditions. He violated those conditions by contacting co-conspirators and discussing the case and advising them to contact him on a new phone to avoid detection of law enforcement agents. He now understands very well the ridiculous folly of the game he was playing and what it cost him. He came clean about this serious conduct and acknowledged his fault.

#### 2. History and characteristics of the defendant

Mr. LaCola was born and raised in Staten Island. He graduated from St. Peter's Boys High School then studied for a year at Wagner College and then studied for a few years at the

College of Staten Island. While he did not earn a degree, his studies were focused on marketing and finance. During college, Mr. LaCola worked at a hospital and worked for a summer at Island Wide Produce in Staten Island where he reconnected with a friend whom he knew from their neighborhood when they were young kids. Thereafter, Mr. LaCola worked for Erjo Inc. and Parrotta Trucking making truck deliveries.

Around 2007, Mr. LaCola suffered the loss of his significant other of 20 years who passed away. He was in a state of depression and cut himself off from others for some time. When he began to get himself back out of the house, he ran into his old friend who owned a pizzeria in Mr. LaCola's neighborhood. Mr. LaCola began hanging out at the pizzeria and came to see the pizzeria owner as a trusted friend. Because of this friendship, when this friend came to Mr. LaCola in need of financial assistance stating he was in trouble because he owed money to the government, Mr. LaCola lent the friend money to help him and his family.

Thereafter, Mr. LaCola attempted opening a produce company with friends who had connections in the produce and restaurant industries, but this ultimately failed. While Mr. LaCola was briefly involved in a television show, *Staten Island Hustlers*, on CNBC, he did not gain much in earnings. He could no longer afford his home in Staten Island and sold it rather than face foreclosure. Mr. LaCola began pursuing the opportunity of legitimate marijuana business in California – his "dream job." But this required investment capital he did not have. He lived in California from late September 2014 to January 2015 pursuing a prospect with one investor that ultimately did not materialize. He continued trying to raise funds and pursue partners to establish a legal marijuana venture, including working with his friend Patrick Tidalgo, who joined in this pursuit.[2]

---

[2] We note as to PSR ¶ 70, other investors contributed to the costs of a warehouse and license for the legal marijuana grow-house – it was not Mr. LaCola who put up that money.

10

After repeated efforts and failed deals, Mr. LaCola returned to New York and went to his old friend to get back the money he had previously lent him. During this time, the friend had repeatedly suggested to Mr. LaCola that he become involved in cocaine deals in order to make fast money. Mr. LaCola had rejected this proposal for some time and sought to stick to legitimate business but when Mr. LaCola returned to New York and the friend could not pay back on the loan, Mr. LaCola agreed to get involved in the activities underlying these offenses.

Mr. LaCola has no prior convictions and no history of violence, substance abuse, or mental health issues. Though resources have been limited due to the pandemic, Mr. LaCola has participated in one math class at MDC and has recently signed up for another course on financial savings. In the last two years he has had only one disciplinary infraction that involved conduct of his cellmate and was ultimately suspended and cleared.

Mr. LaCola has the support of his family and some close friends (submitted with this memorandum as Exhibit A). Mr. LaCola's sister, brother-in-law, niece, and nephew have submitted letters (Exhibit A-1 to A-4) expressing their continued support for him as reflected in their own words in their attached letters. His sister and brother-in-law, Josie and Louis Mangan, will welcome Mr. LaCola into their home upon his release. Mr. LaCola's elderly mother lives there as well and is aware of Mr. LaCola's arrest and plea and remains supportive of him. Mr. LaCola also has some close friends who express their support for the Court's consideration as well. (Exhibit A-5 to A-9)

3. **The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense**

Based on the limited extent of Mr. LaCola's involvement and control over the operations combined with his lack of criminal record and the policy goals of the safety valve for which he

qualifies, along with the impact of COVID-19 on Mr. LaCola's time incarcerated to now, time-served is a just punishment.

Mr. LaCola was remanded on May 3, 2019 for his post-arrest conduct and has been in custody at MDC since that time. As well-known to the Court, when the COVID-19 pandemic began to spread in the United States in early 2020, restrictive measures in prisons were taken in an effort to contain the spread of coronavirus, including at MDC where Mr. LaCola has been incarcerated. *See, e.g., Chunn v. Edge*, 465 F. Supp. 3d 168, 179 (E.D.N.Y. 2020)(MDC's COVID-19 Action Plan phase implemented on March 13, 2020 included suspending virtually all legal and social visitation and put in place modified operations including lockdowns where inmates are secured in their cells) For the last year, the most that Mr. LaCola has been let out of his cell has been for 3 hours in one day and that was only allowed for a few months. For most of the last year, Mr. LaCola has been on lockdown in his five by nine foot cell with a cellmate for almost 23 hours a day. The short time inmates are released from lockdown have been their only chance to get a shower or to try to call their family or try to call their attorney or use the computer, often being forced to just pick one. Thus, inmates have limited in recreation and cannot participate in any courses or other rehabilitative activities in addition to a limited ability to stay in contact with friends or family in the outside community.

Courts have recognized that the pandemic has made "incarceration harsher and more punitive than would otherwise have been the case" because federal prisons "have had to impose onerous lockdowns and restrictions that have made the incarceration of prisoners far harsher than normal." *United States v. Rodriguez*, 00 CR. 761-2 (JSR), 2020 WL 5810161, at *3–4 (S.D.N.Y. Sept. 30, 2020)(granting motion to reduce sentence based in part because "the actual severity of [defendant's] sentence as a result of the COVID-19 outbreak exceeds what the Court

anticipated at the time of sentencing."); *see also*, *United States v. Mel*, CR TDC-18-0571, 2020 WL 2041674, at *2–3 (D. Md. Apr. 28, 2020) ("The fact that Mel has been incarcerated at FCI-Danbury during a serious outbreak of COVID-19 inside the facility sufficiently increased the severity of the sentence beyond what was originally anticipated that the purposes of sentencing are fully met even with the two-week reduction. Indeed, the actual severity of the sentence as a result of the COVID-19 outbreak exceeds what the Court anticipated at the time of sentencing. Accordingly, the Court finds that the requested reduction is warranted upon consideration of the § 3553(a) factors.")  In light of this circumstance, courts have credited defendants with additional time served due to the severity. *See, e.g., United States v. Macfarlane*, 438 F. Supp. 3d 125, 126–27 (D. Mass. April 14, 2020)("Given the described circumstances, the Court determines that Macfarlane's two-week confinement in solitary quarantine in a higher security facility is the equivalent of two months in the Camp to which he was originally assigned. The Court therefore deems that, after he has completed his 14-day quarantine on April 21, 2020, Macfarlane will have served more than five months of his sentence. The Court will thereupon reduce his sentence to time served…")

It is appropriate to consider these pre-trial conditions in assessing an appropriate sentence for Mr. LaCola. *See, United States v. Carty*, 264 F.3d 191, 196–97 (2d Cir. 2001)("pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures") Because of the severe conditions under which Mr. LaCola has been incarcerated at MDC for the last year, we submit that the COVID-19 time should be credited as two years (for a total of effectively three years already served).

We also point out an additional punishment Mr. LaCola has suffered as a collateral matter. He had settled his past employment positions and was working with investors to develop

13

a legal marijuana cultivation business in California. Now, as a drug felon, that occupation is forbidden.

4. **The need for the sentence imposed to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant**

Just before his arrest, Mr. LaCola wanted out, coming to realize what he was risking and that he should instead only pursue his ambitions in legal cannabis. He stupidly thought he could make fast money off a cocaine deal and get back the money he loaned to his friend by arranging the money laundering connection. He thought he would then be home free for California and the legal cannabis market.  He risked everything and lost it and has had nothing but that to dwell on since being remanded over the last two years.  He is a first-time offender and this is the first time he has been incarcerated. He is now 54 years old. Based on his age, record, time-served, and all he has lost along with his freedom, time-served is adequate to deter Mr. LaCola and protect the public from any further crimes.

5. **The need for the sentence imposed to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner**

There is no such particular need here.

6. **The kinds of sentences available and sentencing range**

The PSR initially calculated a guidelines range of 87 to 108 months based on the offense level of 29. The cocaine conspiracy count carries a mandatory minimum of five years. However, as shown above, Mr. LaCola is eligible for the safety valve, and a two-level downward departure. Thus, the offense level should be 27 and with a criminal history category of I, the guideline range is 70 to 87 months.  The Court should disregard the mandatory minimum of five years.  We submit a downward departure is appropriate.

7. **The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct**

As of this time, the co-conspirators have not been sentenced.

A sentence of time-served or three years fits within the appropriate range in consideration of Mr. LaCola having no prior criminal record or history of violence, his age, and the limit of his involvement.

*Contrast,* examples of higher sentences involving more extensive drug operations and money laundering operations: *United States v. Hidalgo*, 462 F. Supp. 3d 470, 475 (S.D.N.Y. 2020)(defendant sentenced to 36 months where he participated in a money laundering operation for a considerable period of time, from 2008 to 2013, did business with narcotics traffickers, purchasing over $6 million dollars of commodities from narcotics traffickers with full knowledge that the commodities were the fruits of narcotics trafficking activities, and court found that the defendant's activities were an important part of narcotics trafficking); *United States v. Rubin*, 743 F.3d 31, 34 (2d Cir. 2014)(36 month sentence for conspiracy to violate the Unlawful Internet Gambling Enforcement Act, conspiracy to commit bank fraud, and conspiracy to launder money where defendant had lengthy criminal record and played a central role in the fraud and money laundering conspiracies charged); *United States v. Echeverria*, 18 CR. 347 (RMB), 2020 WL 7625145, at *5 (S.D.N.Y. Dec. 22, 2020)(defendant with criminal history category I sentenced to 72 months where involved in distributing 10 kilograms of cocaine and also "approximately nine million dollars' worth of illegal narcotics proceeds, over a multi-year period, in concert with others" and defendant "did not merely participate in a few isolated money laundering instances" but "regularly worked for narcotics traffickers, assisting them in moving money they earned through their drug dealing and thereby sustaining their narcotics trafficking as well as facilitating their concealment of their illegal conduct" and he

"was an eager and enterprising participant in money laundering, seeking out opportunities where available"); *United States v. Santana*, 14-CR-2253 (DMS), 2020 WL 6799697, at *2 (S.D. Cal. Nov. 19, 2020)(Defendant was convicted for conspiracy to launder monetary instruments and sentenced to 97 months where he was a high-level money launderer working to transfer millions of dollars in drug proceeds from the United States to Mexico and Colombia and his actions resulted in the importation of vast amounts of cocaine and methamphetamine into the United States)

**8. The need to provide restitution to any victims of the offense**

No restitution is required here. (PSR ¶96)

The plea agreement provides for forfeiture of $20,000 (Mr. LaCola's profit from this venture). Thus, Mr. LaCola does not object to the government's proposed order of forfeiture (ECF 77) except that while the plea agreement provides that payment is due within 30 days of sentencing, Mr. LaCola has no means to pay that amount at this time. This was raised before Mr. LaCola signed the plea agreement, and his financial status has been confirmed by the PSR (¶¶ 76-82). We note that Probation confirmed that Mr. LaCola was not required to provide the waivers (PSR ¶ 53) typically provided for further financial investigation due to the logistical challenges from Mr. LaCola's incarceration at MDC with COVID-19 restrictions in place. Mr. LaCola disclosed all financial information that he has through counsel and will continue to cooperate with required disclosures. Mr. LaCola does not have funds or assets to pay the $20,000 forfeiture money judgment within 30 days of sentencing but seeks to set up a payment plan upon his release and obtaining of gainful employment.

**SENTENCE PROPOSED**

Through this monumentally stupid folly for which he has taken responsibility and acknowledged his fault and shown remorse, Mr. LaCola has lost all his money, lost his residence, become a felon, and thus has lost any ability to participate in the growing, legal cannabis business. He will leave prison with nothing. He has thus gone from a man with a life, assets, and a promising business to a man who walks out with nothing but empty disgrace.

Considering all the above, we believe this is an appropriate case to depart downward from the guideline range and mandatory minimum five years normally imposed for the charges here and that time-served or a three-year sentence would be appropriate. This is a significant sentence to someone with no criminal record and incarcerated for the first time at Mr. LaCola's age and particularly under the more severe conditions imposed by COVID-19. A longer sentence will not serve to appropriately punish Mr. LaCola but rather seems likely to inhibit rehabilitation and a return to legitimate employment and connection with the law-abiding community.

Dated: February 26, 2021

Respectfully submitted,

MARKHAM & READ

*/s/ Bridget A. Zerner*
Bridget A. Zerner (Bar No. BZ2582)
John J. E. Markham, II (Bar No. JM4744)
One Commercial Wharf West
Boston, MA 02110
Tel: 617-523-6329
Fax: 617-742-8604
Email: bzerner@markhamread.com
*Attorneys for Adolfo LaCola*

Certificate of Service

       I hereby certify that on February 26, 2021 I caused the undersigned to be served with the forgoing by e-filing that motion on the CM/ECF filing system:

AUSA David J. Lizmi
United States Attorney's Office
Eastern District Of New York
271 Cadman Plaza East
Brooklyn, NY 11201
Email: David.Lizmi@usdoj.gov

                                */s/ Bridget A. Zerner*
                                Bridget A. Zerner