

HDM:DJL
F. #2018R00998

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

March 5, 2021

By ECF

The Honorable Margo K. Brodie
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Adolfo LaCola
                Criminal Docket No. 19-187 (MKB)

Dear Chief Judge Brodie:

      The government respectfully submits this letter in advance of the defendant's sentencing, which is scheduled for March 12, 2021. For the reasons set forth below, the government respectfully requests that the Court impose a sentence within the United States Sentencing Guidelines range ("Guidelines" or "U.S.S.G.") of 87 to 108 months' imprisonment as set forth in the Presentence Investigation Report dated December 23, 2020 (the "PSR").

I.    Factual Background

    A.    The Offense Conduct

      The facts of the case are set forth in detail in the Presentence Report. In April 2018, the Internal Revenue Service ("IRS") and Drug Enforcement Administration ("DEA") began investigating a narcotics distribution operation in New York City. (PSR ¶ 7). As part of that larger investigation, a confidential informant – at the direction of law enforcement – recorded a meeting with the defendant. (Id.). The defendant informed the confidential informant that he sold cocaine in Staten Island, New York. (Id.). The two discussed an arrangement for regularly scheduled cocaine purchases in the future. (Id.). Additionally, the informant asked the defendant if he could operate as a "laundry mat," telling the defendant that the informant wanted to be able to do things with the informant's money legitimately. (Id.). The defendant informed the informant that he could speak with his "associates," and would let the confidential informant know if he could launder the narcotics proceeds. (Id.).

      Soon thereafter, the confidential informant contacted the defendant via telephone to arrange for a sample purchase of the defendant's cocaine by a second confidential informant

on May 9, 2018. (PSR ¶ 8). The conversation was recorded by special agents from the IRS and DEA. On May 10, 2018, the confidential informant communicated again with the defendant over the phone – which was also recorded by the investigating agents. (Id.). On that call, the defendant confirmed the quantity of cocaine that he would provide to the second confidential informant. (Id.). Later that same day, the second confidential informant met with the defendant at a location in Staten Island, New York, to conduct the transaction for the 100 grams of cocaine. (Id.). The transaction was monitored by a DEA surveillance team. (Id.). Additionally, the meeting was recorded. (Id.). Special agents observed the defendant give the second confidential informant a shopping bag. (Id.).

Following the meeting, DEA agents met the second confidential informant and took custody of the shopping bag. (PSR ¶ 9). Inside the bag was a package with a white powder-like substance. (Id.). Laboratory testing revealed the substance to be cocaine. (Id.).

Later that same day, the first confidential informant spoke with the defendant by telephone. (Id.). Special agents also recorded this conversation. (Id.). The first confidential informant stated that he confirmed with the second confidential informant that the defendant provided the 100-gram cocaine sample. (Id.).

On May 23, 2018, the first confidential informant spoke with the defendant again via telephone. (PSR ¶ 10). On that call, the first confidential informant again confirmed receipt of the 100-gram sample and additionally confirmed that the second confidential informant provided the defendant with $2,900 as payment for the 100 grams of cocaine. (Id.). During that telephone call, the defendant and the first confidential informant confirmed their plans to meet in Houston, Texas, to discuss further drug trafficking and money laundering activities. (Id.). This conversation was also recorded. (Id.).

On June 6, 2018, the first confidential informant met with the defendant and his co-defendant, Patrick Tidalgo, in Houston, Texas to discuss money laundering of the proceeds of the confidential informant's narcotics enterprise. (PSR ¶ 11). Special agents recorded the meeting by audio and video. (Id.). The defendant informed the first confidential informant that they could launder up to $300,000 a month for the confidential informant. (Id.). Additionally, the defendant also advised the informant that they could transport kilogram quantity shipments of cocaine from Mexico to the Northeast United States. (Id.). One of the shipments of 10 kilograms of cocaine to New York was also discussed as being the source of the 100-gram sample provided to the second confidential informant on May 10, 2018. (Id.). The meeting concluded with the parties agreeing to conduct future drug trafficking and money laundering together. (Id.).

On June 26, 2018, the first confidential informant and the defendant met again – this time in a hotel room in Brooklyn, New York. (PSR ¶ 12). The two met to launder money. (Id.). Special agents recorded the meeting. (Id.). The confidential informant provided the defendant with $100,000 in cash, representing drug proceeds to be laundered, which the confidential informant and the defendant counted to verify the amount. (Id.). The defendant informed the confidential informant that he and his co-defendant would take a ten percent commission and they would therefore provide the confidential informant with a check for $90,000 by July 15, 2018. (Id.). During that meeting, the defendant also informed the

confidential informant that he was trying to sell a kilogram of cocaine from his previous shipment. (Id.). The defendant also stated that once he sells the one kilogram of cocaine, that he would receive another shipment of cocaine. (Id.). The informant told the defendant that once the informant received the check for $90,000, that he would negotiate the purchase of multiple kilograms from the defendant. (Id.).

On September 17, 2018, Tidalgo sent a text message to the first confidential informant which included a screenshot of a computer that showed a wire transfer from his company, Vape Works, LLC, to the confidential informant's account. (PSR ¶ 13). The informant subsequently confirmed with the defendant that the informant received the money. (Id.).

On September 30, 2018, the first confidential informant met again with the defendant and Tidalgo. (PSR ¶ 14). The three met in Costa Mesa, California. (Id.). Special agents recorded the meeting. (Id.). The informant provided Tidalgo with $100,000, which were purported to be heroin proceeds. (Id.). The confidential informant and Tidalgo agreed that Tidalgo would launder the money. (Id.). Tidalgo then placed the money in a bag and left the room. (Id.). On October 16, 2018, the investigating agents' account received a wire transfer in the amount of $90,000 from Vape Works, LLC. (Id.).

On November 29, 2018, Tidalgo and the first confidential informant spoke via telephone. (PSR ¶ 15). Special agents recorded the call. During this conversation, Tidalgo and the informant discussed setting up a meeting with the defendant and Tidalgo's source of supply in Tucson, Arizona. The parties arranged that meeting for December 4, 2018. (Id.). At that meeting, the parties agreed to provide the first confidential informant with shipments of cocaine from Mexico at 10 to 15 kilograms per shipment and the different prices depending on where the cocaine was going within the United States. (Id.). The parties negotiated a shipment of cocaine for delivery to the confidential informant at a future meeting in Tucson, Arizona. (Id.). The parties also discussed showing the informant the "cocaine operation" in Tucson, Arizona. (Id.).

  B. <u>The Defendant's Arrest and Post-Arrest Conduct</u>

The defendant was arrested on March 25, 2019. (PSR ¶ 16). Special agents investigating the matter negotiated with the defendant for his self-surrender. (Id.).

Shortly after his arrest, the defendant indicated his willingness to provide substantial assistance to the government with its investigation into his coconspirators and the larger cocaine distribution network. Based on the defendant's willingness and the prospective value of the defendant's proactive cooperation, the government consented to the defendant's release on bond. The government repeatedly stressed the necessity of secrecy moving forward. Nevertheless, shortly after his arrest, the defendant began informing associates and coconspirators of his arrest. (PSR ¶ 21). Indeed, he instructed two individuals not to answer their phones if he called because the government had his cell phones and the "feds are asking about them." (Id.). The defendant also instructed coconspirators to obtain burner telephones so that they could speak and implored them not to answer calls from his old telephone number because special agents were having him make recorded calls. (Id.).

3

Additionally, following his arrest, the defendant contacted another individual whom he was prohibited from contacting in order to collect on an outstanding loan. Unbeknownst to the defendant, this individual was a confidential informant who notified the government of the defendant's communications.

Following the discovery of the defendant's conduct, the government sought to revoke the defendant's bail. (See Dkt. No. 27). Following his detention, the government did meet with the defendant and defense counsel as the defendant attempted to satisfy the 18 U.S.C. §§ 3553(f)(1-5) factors.

II. Guidelines Calculation

Despite his post-arrest conduct, the defendant has met the criteria set forth in 18 U.S.C. §§ 3553(f)(1-5). Therefore, the Court is permitted to sentence the defendant below the mandatory 60-month minimum sentence. The government agrees with the Guidelines calculation set forth in the PSR. The PSR calculates the offense level to be 29 with a Criminal History Category of I (PSR ¶ 39-45), that results in a Guidelines ranger of 87 months to 108 months imprisonment. (PSR ¶ 84).

III. The Appropriate Sentence

The defendant aspired to be a one-stop-shop for narcotics trafficking and narcotics traffickers. His intention when beginning this enterprise was to become a multi-kilogram cocaine dealer here in New York City. But he also sought to serve as a launderer for the individuals he sold his cocaine to – as well as other traffickers. The defendant proved the seriousness of his intent with the pace at which he could procure and sell cocaine. Indeed, at the December 4, 2018 meeting, the defendant attempted to strike a deal with an informant for a schedule of 10 to 15-kilogram shipments of cocaine from Mexico to the United States. Additionally, he and his coconspirators wasted little time in setting up a laundering operation through Vape Works. And, the defendant traveled country-wide for meetings with potential customers and sources of supply.

Compounding the severity of the defendant's charged conduct were his actions following his arrest. Faced with the consequences of his criminal activity and a mandatory minimum five-year sentence, the defendant's first order of business was to subvert the investigation and alert his coconspirators. He sought to circumvent his prohibition from contacting coconspirators and individuals involved in the charged conduct by encouraging them to obtain burner phones to communicate – and to ignore calls from his old telephone number. Further still, he attempted to collect an outstanding debt from – much to his dismay – an individual who turned out to be a confidential source.

While the government acknowledges that the defendant has satisfied the Safety Valve factors of 18 U.S.C. §§ 3553(f)(1-5), it is only because of the investigation's success in preventing the growth of the defendant's01292017 enterprise. Further, while the defendant ultimately provided a truthful accounting of his charged criminal conduct – he did so while surreptitiously undermining the investigation, lying to the investigating agents and disregarding the terms of his release on Pretrial Supervision.

4

The defendant's conduct, both charged and following his arrest, requires a Guidelines' sentence. Such a sentence reflects the seriousness of the defendant's conduct – but also respect for the law. Further, a Guideline's sentence will afford adequate deterrence and protect the public from further crimes of the defendant. Accordingly, the government respectfully requests that the Court impose a sentence within the Guidelines range of 87 to 108 months.

IV. <u>Conclusion</u>

For the foregoing reasons, the government respectfully requests the imposition of a Guidelines sentence that is sufficient but not greater than necessary to account for the defendant's conduct and role in the narcotics distribution conspiracy.

Respectfully submitted,

SETH D. DuCHARME
Acting United States Attorney

By: /s/ David J. Lizmi
David J. Lizmi
Assistant U.S. Attorney
(718) 254-7010

cc: Bridget Zerner, Esq. (by ECF)
Clerk of the Court (MKB) (by ECF)